IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| RODNEY CARROLL, TODD VAN DER JAGT, JERRY RAY, TONY JELINEK, STEPHEN ANDERSON, AND FRED MINOR ON BEHALF OF THEMSELVES AND OTHERS SIMILARLY SITUATED; <br><br> Plaintiffs, <br><br> v. <br><br> FLEXSTEEL INDUSTRIES, INC.; JERALD K. DITTMER, DERECK P. SCHMIDT, and UNNAMED FIDUCIARIES OF FLEXSTEEL'S ERISA-GOVERNED SEVERANCE PLAN <br><br> Defendants. | CASE NO. _____ <br><br> COMPLAINT <br><br> Jury Trial Demanded |

**PRELIMINARY STATEMENT**

1. Plaintiffs are former employees of Flexsteel Industries, Inc. (Flexsteel) who bring this action on behalf of themselves and their former co-workers to redress Defendants' violations of the Employee Retirement Income Security Act of 1974 (ERISA), the Worker Adjustment and Retraining Notification Act of 1988 ("WARN Act"), and the Iowa Wage Payment Collection Act.

2. Defendant Flexsteel is the plan sponsor and administrator of the Flexsteel Severance Pay Plan.

3. Defendants refused to pay employee benefits as required by its ERISA-governed severance plan when it terminated eligible employees from January 1, 2020 to the present.

4. Flexsteel failed to provide 60-days' notice or the equivalent amount of pay to employees required by the WARN Act when it closed two locations, Dubuque, Iowa and

Starkville, Mississippi, on or around April 28, 2020 that employed a total of approximately 370 workers.

5. Flexsteel failed to pay Dubuque employees all wages due under the Iowa Wage Payment Collection Act.

## JURISDICTION

6. This Court has jurisdiction over this matter pursuant to 29 U.S.C. §1132(e)(1) (ERISA); 29 U.S.C. §2104(a)(5) (WARN Act); and 28 U.S.C. §1331 (Federal Question Jurisdiction). This Court should exercise supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiffs' Iowa Wage Payment Collection Act claims because the same underlying facts support both the federal and state law claims.

## VENUE

7. Venue is proper in this District pursuant to 28 U.S.C. §1391(b); 29 U.S.C. §1132(e)(2); and 29 U.S.C. §2104(a)(5).

## PARTIES

8. Plaintiff Rodney Carroll resides in the Northern District of Iowa. Mr. Carroll worked at Flexsteel in the Dubuque office from June 2014 until April 28, 2020.

9. Plaintiff Todd Van Der Jagt resides in the Northern District of Iowa. Mr. Van Der Jagt worked at Flexsteel in the Dubuque office from September 1997 until April 28, 2020.

10. Plaintiff Jerry Ray resides in the Northern District of Mississippi. Mr. Ray worked at Flexsteel in the Starkville office from November 1985 to April 28, 2020.

11. Plaintiff Tony Jelinek resides in the Northern District of Iowa. Mr. Jelinek worked in production at Flexsteel Dubuques from August 1992 until June 24, 2020.

12. Plaintiff Stephen Anderson resides in the Northern District of Mississippi. Mr. Anderson worked for Flexsteel in the Starkville office from January 1993 until April 28, 2020.

13. Plaintiff Fred Minor resides in the Northern District of Mississippi. Mr. Minor worked in production at Flexsteel in Starkville, Mississippi from December 1989 to April 28, 2020.

14. Flexsteel Industries, Inc. ("Flexsteel") is a Minnesota corporation with its principal place of business in the Northern District of Iowa—Dubuque, Dubuque County, Iowa.

15. Flexsteel is the sponsor and administrator of its severance plan designed to help employees transition in the event of employment termination.

16. Flexsteel currently employs approximately 1,600 people worldwide.

17. Flexsteel hired Defendant Jerald K. Dittmer as CEO on December 28, 2018.

18. Defendant Jerald K. Dittmer is the CEO of Flexsteel and is a Flexsteel plan fiduciary who breached his fiduciary duties to the severance plan and plan participants.

19. Flexsteel hired Defendant Dereck P. Schmidt as CFO on April 6, 2020.

20. Defendant Dereck P. Schmidt is a Flexsteel Plan Fiduciary who breached his fiduciary duties to the severance plan and plan participants.

21. Flexsteel had additional unnamed fiduciaries of the Flexsteel Severance Plan who breached their fiduciary duties to the severance plan and plan participants.

**CLASS ACTION ALLEGATIONS**

22. Plaintiffs seek to bring claims on behalf of a class of all former employees of Flexsteel who were terminated by Flexsteel after January 1, 2020 and were damaged by Flexsteel's refusal to pay severance benefits in violation of Flexsteel's ERISA-governed

severance plan and/or who were harmed by Flexsteel's violation of the WARN Act from January 1, 2020 to the present.

23. Plaintiffs propose the class be broken into three sub-classes defined as the following:

    a. Sub-Class I: All persons terminated from any location of Flexsteel Industries, Inc. from January 1, 2020 to present who were not paid a severance and were not regular production, maintenance employees, custodians, or truck drivers.

    b. Sub-Class II: All persons who were employees of Flexsteel Industries, Inc. employed in Dubuque, Iowa who suffered an employment loss, as defined in 29 U.S.C. §2101(a)(6), within the 90-day period starting on April 28, 2020.

    c. Sub-Class III: All persons who were employees of Flexsteel Industries, Inc. employed in Starkville, Mississippi who suffered an employment loss, as defined in 29 U.S.C. §2101(a)(6), within the 90-day period starting on April 28, 2020.

24. Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of the Class and Sub-Classes defined above.

25. Individual Plaintiffs may be members of two sub-classes because some Plaintiffs have both ERISA and WARN Act claims.

26. Certification of a class of persons who may receive relief as a result of this action is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because:

    a. The class members are so numerous that it is impractical to bring all class members before this Court in individual actions. On information and belief, the classes consist of at least 370 individuals.

      i. Sub-Class I is expected to consist of approximately 75 individuals.

     ii. Sub-Class II is expected to consist of approximately 200 individuals.

   iii. Sub-Class III is expected to consist of approximately 170 individuals.

b. There are questions of law and fact common to the class. Among the common questions are whether Flexsteel had created a severance plan for the benefit of employees who lost their jobs through downsizing; whether the defendants' inside dealing, stock repurchases and defunding of the severance pay plan constituted a breach of fiduciary duty to plan participants; and whether Flexsteel is excused from giving the WARN Act notice because of unforeseen circumstances out of its control.

c. The named Plaintiffs' claims are typical of those of the class. Each member of the class asserts claims for failure to pay severance in accordance with Flexsteel's severance pay plan and/or claims for lost wages because of a WARN Act violation.

d. The named Plaintiffs will fairly and adequately protect the interests of the class and Plaintiffs have retained counsel experienced in matters of this type. Counsel for Plaintiffs have extensive experience in representing employees seeking to recover unpaid wages.

e. Questions of law and fact common to the members of the class predominate over questions affecting only individual members. As mentioned above, the fact and law issues will focus on Flexsteel's treatment of these groups of employees. The company engaged in corporate restructuring that had been planned for several

years and was accelerated using Covid as an excuse to terminate the class without severance. Thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

f.  Testimony and evidence about whether the severance pay plan was an ERISA plan, whether the executive defendants were fiduciaries and breached their fiduciary duties to the plan participants, Defendant's reasons for failing to pay eligible employees' severance will affect and apply to the claims of all members of Sub-Class I. Purely individual questions will be restricted to damages. If this Court does not certify a class action, it will be impractical for individual class members to pursue relief or may lead to a large number of separate lawsuits, all of which would rely on the same kind of proof and require roughly the same amount of time, unnecessarily burdening the court.

g.  Testimony and evidence about whether an unforeseeable business circumstance prevented Defendant from providing 60-days' notice pursuant to the WARN Act will affect and apply to the claims of all members of Sub-Classes II & III. Purely individual questions will be restricted to damages. If this Court does not certify a class action, it will be impractical for individual class members to pursue relief or may lead to a large number of separate lawsuits, all of which would rely on the same kind of proof and require roughly the same amount of time, unnecessarily burdening the court.

**FACTS**

27. Historically Flexsteel manufactured, sourced, and sold residential, recreational vehicle, and custom-designed business and hospitality furniture and was known for its blue-spring steel units.

*Flexsteel's Corporate Restructuring Plans*

28. On May 15, 2019, Flexsteel announced a corporate restructuring that started with the elimination of commercial office and custom-designed hospitality product lines.

29. Flexsteel has been planning to restructure its business by terminating some products, closing production facilities, and reducing its workforce for approximately the last three years.

30. In connection with its restructuring plans, Flexsteel enacted and funded plans and policies for employee separations.

31. Flexsteel paid for the employee severance policies out its general fund.

32. Flexsteel's plans included eliminating its commercial office and hospitality product lines and closing facilities in California, Arkansas, Iowa, and Mississippi.

33. Flexsteel's basic plan involved paying employees severance of one-week of base salary per year worked with a minimum of four-weeks base salary and a maximum of twenty-six weeks base salary.

34. Flexsteel also planned to sell the closed facilities, which would, to a large extent, offset the "restructuring costs" related to employee termination.

35. Flexsteel realized restructuring would result in significant costs, including severance payments to terminated employees and so it allocated funds to pay those severance payments.

36. On June 30, 2019, Flexsteel reporting paying $3,775,000 in severance benefits with an accrual balance in the fund for one-time employee severance payments of $1,731,000.

37. In the fiscal year ending June 30, 2020, the company paid severance benefits of $2,455,000 and reported an accrual balance in the fund for one-time employee severance payments of $1,613,000.

38. As part of its corporate restructuring, in May 2019 Flexsteel closed its Riverside, California manufacturing facility which had primarily manufactured residential furniture. Flexsteel provided a WARN Act notice to 87 employees.

39. Flexsteel paid its Riverside administrative and office staff severance benefits of one-week of base salary per years worked with a minimum of four-weeks base salary and a maximum of twenty-six weeks base salary. Flexsteel paid up to an additional eight-weeks severance pay to some employees. Flexsteel outlined this severance plan in written communications to its employees made in connection with the announcement of the layoff.

40. In May 2019, Flexsteel laid off the entire Commercial Engineering Group in Starkville, Mississippi. Flexsteel transferred these engineering duties to employees in Dubuque.

41. In June 2019 Flexsteel laid-off approximately 50 administrative and office staff company-wide.

42. Consistent with its severance pay plan, Flexsteel paid its laid off employees in June 2019 severance pay of one-week of base salary per year worked with a minimum of four-weeks base salary and a maximum of twenty-six weeks base salary, according to the company's written announcement.

43. On June 18, 2019, Flexsteel announced it was closing its Harrison, Arkansas facility. 109 employees lost their jobs as a result of this closure, which occurred on August 16, 2019.

44. Administrative and office staff from the Harrison facility received a severance payment of one-week of base salary per year worked with a minimum of four-weeks base salary and a maximum of twenty-six weeks base salary. Flexsteel paid up to an additional eight-weeks severance pay to some employees. These payments were made consistent with Flexsteel's severance pay plan, written policy, and announcement.

45. In August 2019, Flexsteel paid an employee terminated from the Dubuque plant severance benefits equal to one-week of base salary per year worked with a minimum of four-weeks base salary and a maximum of twenty-six weeks base salary.

46. For each of the plant 2019 closures, Flexsteel used its discretion to pay enhanced severance benefits to terminated employees deemed to be good performers and/or who were needed to wind up business.

47. In early 2020, Flexsteel terminated multiple salaried employees and hourly office and clerical employees. Some of those employees received severance payments according to the same formula of one-week of base salary per year worked with a minimum of four-weeks base salary and a maximum of twenty-six weeks base salary.

48. Flexsteel did not pay all terminated employees severance of one-week of base salary per year worked with a minimum of four-weeks base salary and a maximum of twenty-six weeks base salary but rather exercised discretion in deciding whether to pay employees severance.

49. On information and belief, Flexsteel's plan used a standard of paying severance only to employees in good standing.

50. Under the terms of the severance plan and the company's plan to restructure itself, there was a need for ongoing administration of the severance plan. Plan administration was needed to calculate entitlement based on years of service, to exercise discretion in determining which employees would be paid higher amounts of severance based on their perceived value to the company, and to exercise discretion in determining which employees would be eligible for a severance payment.

*The COVID-19 Pandemic*

51. On January 23, 2020, China's central government imposed a lockdown in Wuhan, the then-epicenter of the COVID-19 outbreak.

52. On January 30, 2020, the World Health Organization declared COVID-19 a Public Health Emergency of International Concern.

53. On January 31, 2020, the United States Department of Health and Human Services declared COVID-19 a national public health emergency.

54. On March 6, 2020 Flexsteel CEO Jerald K. Dittmer purchased 2,787 shares of Flexsteel stock.

55. On March 9, 2020, Italy's prime minister imposed a national quarantine and told citizens to stay at home to curb the spread of COVID-19.

56. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.

57. On March 24, 2020, Mississippi Governor, Tate Reeves, directed non-essential businesses to close but allowed essential businesses to remain open, including manufacturers of many goods and products, such as steel and household products—products manufactured by Flexsteel.

58. Iowa also temporarily shut down some businesses but did not impose closures on manufacturing facilities such as Flexsteel.

59. On or around March 27, 2020, Flexsteel sent a letter to some employees in Dubuque, Iowa announcing that it was laying off approximately 62 employees for up to three months due to the COVID-19 pandemic and its effect on the business of Flexsteel Industries.

60. While the March 27, 2020 notice claimed to be a WARN Act notice, it provided notice, not of a 6-month or permanent layoff, but only of a 3-month layoff.

61. A 3-month layoff is not a "job loss" under the WARN Act.

62. On April 1, 2020, Flexsteel CEO Jerald K. Dittmer purchased 1,000 shares of Flexsteel stock.

63. On April 6, 2020 Flexsteel issued 78,884 stock options to CFO Dereck P. Schmidt at $9.97 per share.

64. On April 8, 2020, the Chinese city of Wuhan lifted its lockdown.

65. On April 16, 2020, Flexsteel notified its Starkville employees it was temporarily reducing its Starkville workforce effective April 2, 2020 for up to three months. While the notice claimed to be a WARN Act notice, it provided notice, not of a 6-month or permanent layoff, but only of a 3-month layoff.

11

66. Flexsteel's April 16, 2020 letter suggests that it knew at the time that it would be permanently closing the Starkville facility and yet failed to notify its employees.

67. On April 27, 2020, Mississippi Governor Reeves lifted the state's shelter-in-place order.

68. On April 28, 2020, Flexsteel notified Starkville employees that it was terminating its Recreational Vehicle and Hospitality business and would permanently close operations in Starkville effective immediately, resulting in the termination of all 170 Starkville employees.

69. In the April 28, 2020 letter to Starkville employees Flexsteel claimed it was unable to provide more notice of the decision to shutdown Starkville operations because this closure was "not reasonably foreseeable until recently when the full impact of COVID-19 became clear."

70. Flexsteel denied severance to all 170 terminated Starkville employees even though it had maintained a plan and policy for paying severance to terminated employees and had funded it.

71. On April 30, 2020, Flexsteel notified employees in Dubuque that it intended to permanently lay off 208 employee and permanently shut down operations at 501 Seippel Road in Dubuque.

72. Flexsteel treated corporate headquarters and Seippel Road as a single location.

73. Flexsteel housed corporate employees, including the engineering department, at the Seippel Road facility in Dubuque.

74. Corporate headquarter employees frequently used facilities at Seippel Road, including conference rooms.

75. Flexsteel had actually ended operations at 501 Seippel Road two days before it gave notice, except for a few employees who worked until June 30, 2020 finishing in-house orders.

76. Flexsteel failed to provide its Dubuque and Starkville employees with 60 days notice of the plant closure as required by the WARN Act.

77. Flexsteel refused to pay its Dubuque employees severance when it permanently laid off 208 employees and shut down the operations at 501 Seippel Road even though it had maintained a plan and policy for paying severance to terminated employees and had funded it.

78. In the April 30, 2020 letter, Flexsteel stated that it was terminating its Recreational Vehicle and Hospitality business and claimed that it was unable to provide more notice of the Seippel Road shutdown because the circumstances leading to the shutdown "were not reasonably foreseeable until recently when the full impact of COVID-19 became clear."

79. Flexsteel's WARN Act notice to Union representatives did not provide a schedule for separations and did not include the positions and names of employees affected by the Dubuque and Starkville closures as required by the WARN Act.

80. In early to mid-May Iowa allowed previously closed retail establishments, including home furnishing and furniture stores to reopen.

81. Flexsteel had planned to end manufacturing in Dubuque and Starkville prior to March 2020.

82. Flexsteel received $12.7 million from the federal government under the CARES Act, signed into law on March 27, 2020.

13

83. The decision to accelerate Flexsteel's business transformation and close facilities in Dubuque and Starkville instead of "hunkering down" during the coronavirus crisis was not caused by some dramatic action or condition outside Flexsteel's control.

84. Flexsteel had known about the worldwide COVID pandemic for up to 3 months when it laid off Dubuque and Starkville employees in April 2020.

85. Recreational vehicles sales declined in April 2020 due to the impact of the COVID-19 pandemic but rebounded dramatically in the following months. None of Flexsteel's Recreational Vehicle customers permanently canceled their manufacturing or supply contracts with Flexsteel during April 2020.

86. Flexsteel's decision to leave the recreational vehicle market adversely impacted its customers' abilities to manufacture recreational vehicles during a year with record recreational vehicle sales.

87. On May 7, 2020, Derek P. Schmidt, Flexsteel CFO, purchased 10,820 shares of Flexsteel for $90,022.

88. On May 12, 2020, Matthew Kaness, Flexsteel Director, purchased 10,000 shares of Flexsteel for $88,000.

89. On June 1, 2020, Flexsteel announced the first of several stock buy-backs that to date total approximately $38,000,000.

90. On June 9, 2020, Flexsteel CFO Derek P. Schmidt purchased 2,820 shares of Flexsteel for $33,445.

91. On June 11, 2020, Flexsteel CFO Derek P. Schmidt purchased 35,506 shares of Flexsteel for $416,840 at an individual share price of $11.74.

14

92. On July 1, 2020, Flexsteel CEO Jerald K. Dittmer purchased 1,000 shares of Flexsteel for $12,720.

93. As of February 9, 2021, Flexsteel's share price was higher than $35 per share.

94. Plaintiffs and numerous members of proposed Sub-Class 1, attempted to exhaust their administrative remedies by requesting Flexsteel honor its severance plan as outlined during the previous two years.

95. Flexsteel refused to pay eligible employees a severance payment.

**COUNT I—ERISA CLAIMS (SUB-CLASS I)**

96. Plaintiffs restate and incorporate by reference all the previous paragraphs.

97. Plaintiffs bring this claim for payment of severance benefits against Flexsteel, Schmidt and Dittmer as administrators and fiduciaries of the Flexsteel Severance Pay Plan.

98. Flexsteel refused to pay eligible employees severance under the Flexsteel Severance Pay Plan.

99. Flexsteel's severance plan does not include any notice and review provisions.

100. Despite Plaintiffs' requests, Flexsteel refused to provide members of Sub-Class I with written notice containing the specific reasons why it was denying their claim for benefits under the severance plan.

101. Despite Plaintiffs' requests, Flexsteel refused to provide members of Sub-Class I with documents Flexsteel relied upon when they refused Plaintiffs' claims for benefits.

102. Flexsteel failed to provide members of Sub-Class I with a reasonable opportunity for a full and fair review of its denial of severance benefits.

103. Plaintiffs had an expectation or reliance interest in receiving severance based on Flexsteel's past practice and written policy and plan of paying severance to terminated employees in good standing.

104. Flexsteel is estopped from denying members of Sub-Class I severance.

105. Plaintiffs have exhausted any and all applicable administrative remedies, or exhaustion would have been futile.

106. The plan fiduciaries failed to act with respect to the plan solely in the interest of and for the exclusive purpose of providing benefits to the plan participants and their beneficiaries.

107. Defendants Dittmer, Schmidt, and other unnamed fiduciaries breached their fiduciary duties to Plaintiffs and the class by 1) defunding the Flexsteel Severance Pay Plan without notifying plan participants and beneficiaries; 2) putting their own self-interest ahead of the plan participant/beneficiaries' interests; and 3) exercising their discretion over interpretations of plan terms and control of plan assets contrary to the best interests of Plaintiffs.

## COUNT II—DUBUQUE WARN ACT (SUB-CLASS II)

108. Plaintiffs restate and reallege all the previous paragraphs.

109. Flexsteel employed over 100 full-time employees at its facilities in Dubuque, Iowa.

110. Flexsteel's business transformation was reasonably foreseeable at the time it laid off Dubuque employees for a period of up to three months and in fact had been planned for several years.

111. Flexsteel's corporate restructuring was on-going at the time it laid off Dubuque employees for up to three months.

112. Flexsteel's corporate restructuring decisions were solely within its control.

113. Flexsteel's corporate restructuring was not a sudden, dramatic, and unexpected action or condition outside its control.

114. Flexsteel's decision to permanently lay off 208 employees in Dubuque was reasonably foreseeable at the time it laid off Dubuque employees for a period of up to three months.

115. Economic changes caused by the COVID-19 pandemic were reasonably foreseeable at the time Flexsteel provided notice of the three-month layoff on or around March 27, 2020.

116. There was no sudden, dramatic, and unexpected action or condition outside of the employer's control that prevented it from providing 60-days notice as required by the WARN Act.

117. In fact, Flexsteel and the individual defendants used the economic conditions, federal aid and their privileges as executives to enrich themselves, while terminating long term employees without notice or severance.

### COUNT III—STARKVILLE WARN ACT (SUB-CLASS III)

118. Plaintiffs restate and reallege all the previous paragraphs.

119. Flexsteel employed over 100 full-time employees at its facility in Starkville, Mississippi.

120. Flexsteel's business transformation, corporate restructuring and permanent closure of the Starkville facility was reasonably foreseeable at the time it laid off Starkville employees for up to three months in March 2020.

121. Flexsteel's corporate restructuring was on-going at the time it laid off Starkville employees for up to three months.

122. Flexsteel's corporate restructuring decisions were solely within its control.

123. Flexsteel's corporate restructuring was not a sudden, dramatic, and unexpected action or condition outside its control.

124. Economic changes caused by the COVID-19 pandemic were reasonably foreseeable at the time Flexsteel provided notice of the three-month layoff on or around March 27, 2020.

125. There was no sudden, dramatic, and unexpected action or condition outside of the employer's control that prevented it from providing 60-days notice as required by the WARN Act.

126. In fact, Flexsteel and the individual defendants used the economic conditions, federal aid and their privileges as executives to enrich themselves, while terminating long term employees without notice or severance.

## COUNT IV—VIOLATION OF THE IOWA WAGE PAYMENT COLLECTION ACT (SUB-CLASS II)

127. Plaintiffs repeat and incorporate all of the previous allegations.

128. Severance and notice pay constitute wages owed by an employer to its employees.

129. Flexsteel owed Plaintiffs and the employees they seek to represent severance and notice pay under the WARN Act as outlined in this Complaint.

130. Flexsteel's refusal to pay this severance and notice pay is willful and gives rise to a claim for liquidated damages.

## JURY TRIAL DEMANDED

Plaintiffs and the Class demand a trial by jury for their WARN Act claims and their Iowa Wage Payment Collection Act claims.

## PRAYER FOR RELIEF

Wherefore Plaintiffs pray for an award of damages as allowed under 29 U.S.C. § 2104, including back pay and benefits for each day Flexsteel violated the WARN Act and for benefits under an employee benefit plan as described in 19 U.S.C. §1002(3), unpaid wages under the Iowa Wage Payment Collection Act, liquidated damages, attorney fees and costs; interests, and other relief as the Court deems proper.

Respectfully submitted,

*/s/ Dorothy A. O'Brien*
Dorothy A. O'Brien, AT0005877

*/s/ Kelsey A. W. Marquard*
Kelsey A.W. Marquard, AT0011433

O'Brien & Marquard, P.L.C.
2322 East Kimberly Road, Suite 140S
Davenport, Iowa 52807
563-355-6060 Telephone
563-355-6666 Facsimile
dao@emprights.com Email
kawm@emprights.com Email

ATTORNEYS FOR PLAINTIFFS